## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **JOHN W. CARROLL,** | |
| **Plaintiff,** | **CASE NO.  8:13CV0255** |
| **vs.** | |
| **CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration,** | **MEMORANDUM AND ORDER** |
| **Defendant.** | |

John W. Carroll filed a complaint on August 19, 2013, against Carolyn W. Colvin, the Acting Commissioner of the Social Security Administration. (ECF No. 1.)  Carroll seeks a review of the Commissioner's decision to deny his application for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401 et seq. The defendant has responded to Carroll's complaint by filing an answer and a transcript of the administrative record. (See ECF Nos. 11-12). In addition, pursuant to the order of Senior Judge Warren K. Urbom, dated November 26, 2013, (ECF No. 15), each of the parties has submitted briefs in support of his or her position.  (See generally Pl.'s Br., ECF No. 18; Def.'s Br., ECF No. 24). After carefully reviewing these materials, the court finds that the Commissioner's decision must be affirmed.

### I. PROCEDURAL HISTORY

Carroll, who was born on May 24, 1956, (tr. 78) filed an application for supplemental security income (SSI) benefits under Title XVI of the Act on June 7, 2010. (Tr. 89). The application was denied on June 28, 2010, because Carroll had too much income to be eligible for SSI. (Tr. 89). He filed an application for disability insurance

benefits under Title II on June 14, 2010. (Tr. 144-45). He alleged an onset date of March 15, 2010, (tr. 146), but later amended it to May 24, 2011, the date he turned 55. (Tr. 20). Carroll's application for disability benefits was denied initially on September 21, 2010, (tr. 97) and on reconsideration on November 18, 2010. (Tr. 105-08). On November 22, 2010, Carroll requested a hearing before an administrative law judge (ALJ). (Tr. 114). A hearing was held on January 3, 2012. (Tr. 37-77). On February 23, 2012, the ALJ found that Carroll had not been under a disability from May 24, 2011, through the date of the decision. (Tr. 17-34).

An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520(a). The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five. *See id.* Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity (SGA). *See* 20 C.F.R. § 404.1520(a)(4)(i), (b). The ALJ found that Carroll had not been engaged in SGA since May 24, 2011, the alleged onset date. (Tr. 22). Although Carroll drew unemployment benefits and worked for nearly two years after the alleged disability onset date, the ALJ determined that it was not clear whether the work activity rose to the level of SGA, which was $1,000 per month for 2010. Carroll earned $550 per month as a part-time apartment manager and was provided a free apartment. However, the value of the apartment rent was not part of the record. The ALJ gave Carroll the benefit of the doubt in determining that he had not engaged in SGA since the alleged onset date. (Tr. 22). .

2

Step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. § 404.1520(c). A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities" and satisfies the "duration requirement." *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."). Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting."  20 C.F.R. § 404.1521(b). If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(ii), (c).  The ALJ found that Carroll had the following severe impairments: schizophrenia, anxiety, ischemia, congestive heart failure, coronary artery disease, and hypertension. (Tr. 22). The ALJ also found that Carroll suffered from obesity, but it was a nonsevere impairment because there was no evidence that the obesity limited Carroll's ability to perform work-related activities. (Tr. 23).

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments. *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d); *see also* 20 C.F.R. Part 404, Subpart P, App'x 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926). If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled." *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d).

If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five. *See* 20 C.F.R. § 404.1520(a). The ALJ found that Carroll did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 23).

Step four requires the ALJ to consider the claimant's residual functioning capacity (RFC)[1] to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." *See* 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f). If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iv), (f). The ALJ found that Carroll was unable to perform any past relevant work. (Tr. 29).

At step five, the ALJ must determine whether the claimant is able to do any other work considering his RFC, age, education, and work experience. If the claimant is able to do other work, he is not disabled. The ALJ found that Carroll had the RFC to perform medium work as defined in 20 C.F.R. § 404.1567(b), except he could perform only unskilled routine and repetitive work. (Tr. 25).

The ALJ found that there are jobs that exist in significant numbers in the national economy that Carroll could perform. (Tr. 29). Therefore, Carroll had not been under a disability from May 24, 2011, through the date of the decision. (Tr. 30). The Appeals Council denied further review on July 2, 2013. (Tr. 1-7). Thus, the ALJ's decision stands as the final decision of the Commissioner, and it is from this decision that Carroll seeks judicial review.

## II. FACTUAL BACKGROUND

---

[1] "'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)).

## A.   Medical Evidence

Carroll began treatment for hypertension in February 2010. (Tr. 250). He was prescribed medications and referred to a blood pressure clinic. (Tr. 251). At a follow-up visit in March 2010, Carroll reported no side effects from the medications. He reported working out vigorously for 90 minutes a day with no chest pain or shortness of breath. (Tr. 248).

In April 2010, Carroll reported jaw pain. (Tr. 246). An exercise stress echocardiogram showed inferior, inferolateral, and lateral wall ischemia. (Tr. 236, 245). He was prescribed a stronger statin and a beta blocker. (Tr. 245). On April 30, 2010, Carroll had coronary catheterization that showed nonobstructive atherosclerotic coronary artery disease. He was prescribed Crestor and metoprolol. (Tr. 236).

In June 2010, it was reported that Carroll's blood pressure was under good control on medical therapy and that he had no evidence of ischemia or heart failure. (Tr. 235). At the end of June 2010, Carroll reported that he was tolerating Crestor, but he had not started taking metoprolol as prescribed because he was concerned it would cause fatigue. (Tr. 234). He also reported that the testosterone therapy had increased his stamina and energy. However, Carroll said he had quit his construction job because he felt he was unable to keep up. (Tr. 234).

After Carroll reported recurrent chest discomfort and intermittent jaw discomfort, he was evaluated at a cardiac clinic in August 2010. (Tr. 265). It was determined he had cardiomyopathy with segmental wall motion abnormalities of uncertain etiology; coronary artery disease, nonobstructive by description (films were not available for review); hypertension with mild hypertensive heart disease; and hyperlipidemia with an

LDL of 182. Carroll's prescription for Crestor had been changed to simvastatin. (Tr. 267). He was scheduled for a follow-up appointment after the catheterization films had been obtained and reviewed. Carroll was advised that if he had any jaw discomfort with exertion or at rest, he should take one or two sublingual nitroglycerin tablets, and if he continued to have discomfort, he should go to the hospital. (Tr. 267).

On August 25, 2010, Carroll reported no significant jaw discomfort, and he was found to be fairly stable from a cardiovascular standpoint. Lesions observed in the cardiac catheterization films were not obstructive in nature. His previous episodes of chest discomfort with exertion had abated. His blood pressure was not ideally controlled, so his medications were adjusted. (Tr. 263-64).

The first mention in the record of any mental health issues was on June 20, 2011, when Carroll underwent a psychiatric consultation with Vithyalaks Selvaraj, M.D., in the mental health clinic at the Veterans Administration (VA) hospital. (Tr. 404). Carroll reported that his physician wanted him to go to the clinic for anxiety and post traumatic stress disorder (PTSD). He reported that when he worked in construction, he believed people were plotting against him and that he believed he had been discriminated against because he was African-American. Carroll stated that he had been physically violent with Caucasian men. He reported that he was separated from his wife because he was verbally abusive and accused her of cheating and plotting against him. (Tr. 404).

Dr. Selvaraj stated that Carroll's speech had normal rate and rhythm, his mood was anxious, and his affect was blunted. (Tr. 406). He was diagnosed with schizophrenia, paranoid type, and alcohol dependence. Carroll declined a mental health referral, and he was directed to begin taking Seroquel and to continue outpatient care.

6

(Tr. 406). At a follow-up appointment on July 13, 2011, Carroll reported that he was tolerating Seroquel, but he did not take it every day. (Tr. 399). He was told that he needed to take it consistently before the dosage could be increased. (Tr. 399).

On August 4, 2011, Dr. Selvaraj noted that Carroll had prominent paranoia about people trying to poison him and harm him. Carroll reported that he was tolerating Seroquel, but he felt too sedated during the day. (Tr. 386). His mood was euthymic. (Tr. 388). Carroll stated he was not willing to take any psychotropic medication, but he agreed to take Seroquel because it helped him sleep. It was recommended he continue with outpatient therapy.  (Tr. 389).

In August 2011, a cardiologic consultation noted that Carroll's symptoms had been stable over the past year. (Tr. 380). After a stress echocardiogram, Carroll was advised to begin taking coreg rather than metoprolol. (Tr. 383). Later that month, Carroll reported that he had episodes of dizziness when he exercised. He was able to ambulate independently at the appointment without any assistive devices. (Tr. 375).

Dr. Selvaraj saw Carroll again on October 4, 2011. He was not compliant with his medications, even though he admitted that he felt better when he took the medications. (Tr. 372). Dr. Selvaraj noted that Carroll was still paranoid, but his mood was euthymic. (Tr. 373-74). It was recommended that he continue current medications and continue as an outpatient. (Tr. 374).

In November 2011, Carroll reported that he continued to have chest pain associated with strenuous exercise which lasted for hours but improved with nitroglycerin. He reported that he had fewer episodes of chest pain since starting coreg. (Tr. 368). Later that month, it was noted that Carroll was not compliant with simvastatin.

7

He was to be rechecked on the next visit and if he was not at his goal, he would need a more potent statin. (Tr. 370). On December 22, 2011, x-rays of Carroll's chest showed no evidence of cardiac enlargement and the lungs were normal. There was mild prominence of the ascending aorta, which could be due to aging or actual developing small ascending aortic aneurysm. (Tr. 304).

## B.    Medical Opinion Evidence

Jerry Reed, M.D., completed a physical RFC on September 17, 2010. (Tr. 291-98). He determined that Carroll could occasionally lift and/or carry 50 pounds and could frequently lift and/or carry 25 pounds. (Tr. 292). He could sit, stand, or walk about six hours in an eight-hour workday. He had no limitations in the ability to push and/or pull. Dr. Reed stated that Carroll should reasonably avoid heavy/strenuous activities but was noted to be remarkably fit and an avid exerciser, frequently working out for up to two hours a day. He retained the ability to perform a wide range of activities. (Tr. 292). Carroll had no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 293-95). James Bane, M.D., affirmed Dr. Reed's physical RFC on November 16, 2010. (Tr. 300).

A mental RFC assessment was completed on January 23, 2012, by Dr. Selvaraj. (Tr. 425). He stated that Carroll had marked limitation in the ability to deal with work stress. He had paranoid delusions and believed people were trying to poison him, and he had isolated himself. (Tr. 425). Carroll also had marked limitation to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Selvaraj stated Carroll was distractible, irritable, and actively

8

psychotic. He had extreme limitation in the ability to accept instructions and respond appropriately to criticism from supervisors or coworkers. Carroll had a history of physical aggression, and Dr. Selvaraj did not think he would take criticism well. (Tr. 426).

## C.    Hearing Evidence

At a hearing on January 3, 2012, Carroll stated that he had no inpatient hospitalizations in the last year. (Tr. 39-40). Carroll stated that he graduated from high school and attended college for two years but he did not receive a degree. (Tr. 44). He attended a union school to become a carpenter. At the time of the hearing, Carroll was working part-time as an apartment manager, for which he received a free apartment. (Tr. 46, 51). Carroll stated that he had quit a carpenter job because he had a lot of anxiety and he was afraid he would hurt someone. (Tr. 48). Carroll said he drew unemployment for at least one year. (Tr. 52). During that time, he looked for a less physical job. (Tr. 53). Carroll said he cannot work because he had chest pain and got fatigued when he exerted himself. (Tr. 55). Carroll said he had stopped exercising because he was afraid he would have chest pains and then would have to take nitroglycerin. (Tr. 57). Carroll said he could walk a couple of miles. (Tr. 61).

During the day, Carroll stated that he helped take care of his 2-year-old son while the son's mother looked for work. (Tr. 62-63). In the afternoon, he worked as an apartment manager, which required him to walk around the building to check for emergencies. He then returned to his apartment and watched television. Carroll said he also walked around the building once in the evening. (Tr. 63).

Carroll said he started seeing a psychiatrist for anxiety about 10 months earlier. (Tr. 65-66). He had also gone through a period where he was concerned that he was

9

going to hurt someone and that he thought people were trying to poison him. He was given medication to help him sleep. (Tr. 66).

Steven Schill, a vocational expert (VE), stated that an individual with Carroll's limitations, who could perform medium exertional work, occasionally lifting or carrying 50 pounds and frequently lifting or carrying 25 pounds, and with no restriction in standing, sitting, or walking, would be able to return to past work as a carpenter. (Tr. 72-73). In the region, there were 6,400 carpenter jobs and in the national economy, there were 520,000. Schill stated that Carroll could also work as a janitor. There were 36,000 janitorial positions in the region and 965,000 in the national economy. Carroll could work as a kitchen helper, which is unskilled medium. (Tr. 73). In the region, there were 17,000 positions, and in the national economy, there were 521,000 positions. He could also be employed as a laundry room worker, which had 2,600 jobs in the region and 86,000 jobs in the national economy. (Tr. 74). If the individual was limited to light exertional work, meaning he was able to occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, and stand, sit, or walk six hours in an eight-hour day, occasionally do postural activities, and avoid working outside in the cold or heat, Carroll had no transferable skills. (Tr. 74). Schill stated that if the individual had marked limitations in mental health, he would be eliminated from employment. (Tr. 75).

## D.    Additional Evidence

In interrogatories, Carroll stated that he suffered from congestive heart failure, high blood pressure, coronary artery disease, schizophrenia, and anxiety. (Tr. 207). Carroll stated that when he did any physical activity for more than an hour or two he developed severe pain in his heart which sometimes lasted all night or resulted in a

hospital stay. His mental condition made the stress unbearable. (Tr. 207). He had received unemployment benefits. (Tr. 208). Carroll stated he took medication as prescribed and it was effective, although some medications made him drowsy during the day. (Tr. 209). He said he could walk for 20 minutes, stand for 10 minutes, and sit for 45 minutes in an eight-hour workday. (Tr. 211). Carroll said he could lift 25 pounds with one hand or 50 pounds with both hands. (Tr. 211). For exercise, he walked for 20 minutes. He watched television for two hours at a time. Carroll said he was able to shower or bathe, brush his teeth, shave, and perform other personal hygiene. He was able to perform household chores such as vacuuming, dusting, sweeping, washing dishes, scrubbing floors, mowing the lawn, making beds, doing laundry, and cooking. (Tr. 213). Carroll stated he worked two hours a day as an apartment manager. (Tr. 214).

## III.  STANDARD OF REVIEW

This court must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings." *Johnson v. Chater*, 108 F.3d 178, 179 (8th Cir. 1997) (quoting *Clark v. Chater*, 75 F.3d 414, 416 (8th Cir. 1996)).  *See also Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011). "Substantial evidence is less than a preponderance but enough that a reasonable mind might accept as adequate to support the conclusion." *Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013) (internal citations omitted).  A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010).  Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and

requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action." *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted). *See also Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010) ("Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision.").

This court must also determine whether the Commissioner's decision "is based on legal error." *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (quoting *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Id.* (citations omitted). No deference is owed to the Commissioner's legal conclusions. *See Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003). *See also Collins*, *supra*, 648 F.3d at 871 (indicating that the question of whether the ALJ's decision is based on legal error is reviewed de novo).

## IV.   ANALYSIS

### A.   RFC Assessment

Carroll argues that the ALJ's RFC assessment was unsupported by substantial evidence based on the record as a whole. (Pl.'s Br. at 5). As noted previously, the RFC is what the claimant is able to do despite limitations caused by all of his impairments. *Lowe v. Apfel, supra*. "The RFC is used at both step four and five of the evaluation process, but it is determined at step four, where the burden of proof rests with the claimant." *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the

medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" *Id.* A disability claimant has the burden to provide evidence of his impairments and to prove his RFC. *See* 20 C.F.R. §§ 404.1512(a) and (c), 416.912(a) and (c).

The sole mental RFC assessment in the record was completed by Dr. Selvaraj, who also treated Carroll. (Tr. 425). Dr. Selvaraj found that Carroll had marked limitation in the ability to deal with work stress, to complete a normal workday and workweek, and to perform at a consistent pace. Dr. Selvaraj also stated that Carroll had extreme limitation in the ability to accept instructions and respond appropriately to criticism. (Tr. 426).

The ALJ found that Carroll's mental impairments did not meet or medically equal any listing. (Tr. 23). The ALJ stated that Carroll had mild difficulties in social functioning. Although Dr. Selvaraj opined that Carroll had a serious limitation in social functioning, the ALJ noted that the record showed Carroll was able to perform duties as an assistant building manager, to maintain a marriage, and to care for his children. During a mental status examination, Carroll's motor behavior was normal, his eye contact was good, his facial expressions were normal, and his attitude was cooperative. The ALJ gave Carroll the benefit of the doubt but found that he had no more than a mild limitation in social functioning. (Tr. 24).

The ALJ found that Carroll had only a moderate limitation in the area of concentration, persistence or pace. (Tr. 24). Again, Dr. Selvaraj stated that Carroll had a marked limitation in the ability to deal with work stress and to perform at a consistent pace. However, the ALJ noted that Dr. Selvaraj found that Carroll's cognition was

grossly intact and his fund of knowledge was average. He had the necessary concentration to perform the duties of an assistant building manager. (Tr. 24).

The ALJ also noted that after Carroll started treatment for schizophrenia and anxiety in June 2011, he refused all medications with the exception of Seroquel. (Tr. 27). Thus, there was evidence that Carroll had not been entirely compliant in taking prescribed medications, which suggested that the symptoms were not as limiting as Carroll had alleged. The ALJ gave Carroll the benefit of the doubt regarding all his alleged impairments and stated that the RFC reflected those symptoms. (Tr. 28).

The ALJ gave little weight to Dr. Selvaraj's opinion because it was not supported by a majority of the objective medical evidence and was out of proportion with the Veterans Administration progress notes. In addition, Carroll had very little history of psychological treatment. (Tr. 28). He was not in counseling and had not yet been taking medication for 12 months. He was, in fact, responding favorably to the medication when he chose to take it. (Tr. 29).

An ALJ must give a treating physician's opinion controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009), *citing* 20 C.F.R. §§ 404.1527(d)(2), 416.927 (d)(2). If the opinion fails to meet these criteria, however, the ALJ need not accept it. *Brace*, 578 F.3d at 885. An ALJ is warranted in discrediting some of the treating physician's opinions, in light of other inconsistent or contradictory evidence in the record. *Weber v. Apfel*, 164 F.3d 431 (8th Cir. 1999).

14

An ALJ's decision to "discount or even disregard the opinion of a treating physician" will be upheld where other medical assessments "are supported by better or more thorough medical evidence," or "where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Cantrell v. Apfel*, 231 F. 3d 1104, 1107 (8th Cir. 2000). "[T]he ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians." *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011), *quoting Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007).

Dr. Selvaraj's opinion was not due controlling weight because it was inconsistent with other substantial evidence in the record, including the psychiatrist's own treatment notes. Carroll consistently demonstrated good grooming and hygiene, normal motor behavior and eye contact, a cooperative attitude, and euthymic mood during appointments with Dr. Selvaraj. (Tr. 373, 388, 400).

In addition, the record showed that Carroll was not always compliant with his medications. (Tr. 372, 399). Dr. Selvaraj noted that Carroll was unwilling to take any other psychotropic medication. (Tr. 389). Carroll seemed to understand that his symptoms could improve when he took medication, as he acknowledged to Dr. Selvaraj that he felt better when he took the medication. (Tr. 372).

An ALJ has the duty, at step four, to formulate the claimant's RFC based on all the relevant, credible evidence of record, including medical records, observations of treating physicians and others, and an individual's own description of his limitations. *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000).

15

The ALJ found that Carroll's alleged limited daily activities could not be objectively verified with any reasonable degree of certainty. (Tr. 26). And even if his daily activities were as limited as alleged, it was difficult to attribute that degree of limitation to Carroll's medical condition in view of the relatively weak medical evidence. Overall, the ALJ determined that Carroll's reported limitations in daily activities were outweighed by other factors. The ALJ found that Carroll's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with the RFC. (Tr. 26-27). The objective findings failed to provide strong support for Carroll's allegations of disabling symptoms and limitations resulting from his impairments.

The ALJ properly gave the opinion of Dr. Reed significant weight because it was supported by a majority of the objective medical evidence, Dr. Reed had expertise in disability cases, and he thoroughly reviewed the record. (Tr. 28). Dr. Reed opined that Carroll could perform medium level exertional work. Dr. Bane also opined that Carroll was capable of performing medium work.

The ALJ found that Carroll's credibility was weakened by inconsistencies between his allegations, his statements regarding daily activities, and the medical evidence. (Tr. 29). The record showed that Carroll was capable of exercising one hour daily, could walk two miles, drove a vehicle, cared for his son, and worked part time as an apartment manager. His cardiac condition was well controlled. He had drawn unemployment for more than one year. The ALJ noted that the inconsistent information provided by Carroll might not be the result of a conscious intention to mislead, but the inconsistencies suggested that the information he provided was not entirely reliable. (Tr.

29). The ALJ is in the best position to determine the credibility of the testimony and is granted deference in that regard. *Johnson v. Apfel*, 240 F.3d 1145 (8th Cir. 2001). An ALJ is entitled to make a factual determination that a claimant's subjective complaints are not credible in light of objective medical evidence to the contrary. *Ramirez v. Barnhart*, 292 F.3d 576 (8th Cir. 2002). The court will not substitute its opinion for that of the ALJ.

The ALJ weighed the opinions of Drs. Reed, Bane, and Selvaraj. An ALJ evaluates the findings of State agency consultants as medical opinions under the regulations. *See* 20 C.F.R. §§ 404.1527, 416.927(f)(2). Social Security Ruling 96-6p provides that, in appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources.

The ALJ thoroughly reviewed all of the medical evidence in the record, along with the opinions of physicians and testimony presented at the hearing. The RFC established by the ALJ was supported by the evidence.

## B.    Failure to Properly Develop Record

Next, Carroll argues that the ALJ failed to properly develop the record. (Pl.'s Br. at 8). Carroll suggests that the ALJ should have obtained a consultative mental examination rather than relying only on the opinion of Carroll's treating psychiatrist, Dr. Selvaraj. (Pl.'s Br. at 8-9).

The U.S. Court of Appeals for the Eighth Circuit has held that there is no bright line rule for when the Commissioner has or has not adequately developed the record. *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008). The assessment of whether the

record is adequate is made on a case-by-case basis. *Id.* Where the medical records, the claimant's statements, and other evidence constitute sufficient medical evidence to determine whether the claimant was disabled the ALJ was not required to obtain additional evidence. *Halverson v. Astrue*, 600 F.3d 922, 933 (8th Cir. 2010). In the present case, the ALJ had the benefit of the treatment notes from the Veterans Administration which detailed Carroll's appointments with Dr. Selvaraj. The ALJ found the notes not fully credible. The record contained sufficient evidence the ALJ could use to formulate Carroll's RFC, and there was no error in her failure to further develop the record.

## C.      Vocational Expert Testimony

Finally, Carroll asserts that the ALJ submitted an inaccurate hypothetical to the VE and that the VE testimony did not constitute substantial evidence on which the ALJ could rely. (Pl.'s Br. at 9). The VE testified that a hypothetical person with Carroll's vocational profile and RFC could perform other work as a janitor, kitchen helper, and laundry room worker. (Tr. 71-74). The ALJ found that Carroll could perform other work exiting in the national economy. (Tr. 29-30).

Carroll's argument reiterates his objections to the RFC findings, which the court discussed above. The ALJ included all of Carroll's restrictions from the RFC in the hypothetical question to the VE. For a VE's opinion to be relevant, an ALJ must accurately characterize a claimant's medical conditions in hypothetical questions posed to the VE. *Harvey v. Barnhart*, 368 F.3d 1013, 1016 (8th Cir. 2004). A VE's answer to a hypothetical question that includes all the limitations in the RFC provides a proper basis for an ALJ's decision. *See id.*

The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). The Commissioner may satisfy this burden through the testimony of a VE. *See* 20 C.F.R. §§ 401.1566(e), 416.966(e). The ALJ was justified in relying on the VE's testimony as substantial evidence to find that Carroll was not disabled. *See* 20 C.F.R. §§ 404.1566(e), 416.966(e). The VE's testimony was supported by the record as a whole.

## V.   CONCLUSION

For the reasons discussed, the court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and should be affirmed. Accordingly,

IT IS ORDERED:

1.    The Commissioner's decision is affirmed;

2.    The appeal is denied; and

3.    Judgment in favor of the defendant will be entered in a separate document.

Dated this 16th day of July, 2014

                                                BY THE COURT:

                                                s/Laurie Smith Camp
                                                Chief United States District Judge